# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 06-20307-TLM** |
| **RANDALL JOSEPH MEEK and** | ) | |
| **KATHY LYNN MEEK,** | ) | **MEMORANDUM OF** |
| | ) | **DECISION** |
| Debtors. | ) | |
| _____ | ) | |

## INTRODUCTION

In this case, the chapter 13 debtors, the chapter 13 trustee and the U. S. Trustee[1] disagree on how several provisions of the Bankruptcy Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA") should be interpreted and applied. In particular, in the context of confirmation of the debtors' proposed chapter 13 plan, they disagree on how "projected disposable income" for "above median income" chapter 13 debtors should be calculated. The matter was framed by the debtors' proposed plan and the chapter 13 trustee's objection. Following argument at an April 10, 2007 non-evidentiary hearing, it was taken under advisement.[2]

_____

[1] The Court invited the United States Trustee to participate since this case raises issues of first impression in the District. The U.S. Trustee filed a brief, Doc. No. 39, and its counsel presented argument at hearing.

[2] This Decision constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052, 9014.

MEMORANDUM OF DECISION - 1

**BACKGROUND AND FACTS**

Randall and Kathy Meek ("Debtors") filed a joint chapter 13 petition on

November 29, 2006, and BAPCPA amendments apply to their case.

Among Debtors' required filings was Official Form 22C, the "Chapter 13

Statement of Current Monthly Income and Calculation of Commitment Period and

Disposable Income."  Doc. No. 6.[3]  There Debtors disclosed combined monthly

income of $5,535.47 (*id.* at line 11) and, following completion of the Form,

calculated a "monthly disposable income under § 1325(b)(2)" of $0.00 (*id.* at line

58).

Also among Debtors' required and filed schedules and statements was

Schedule I, Current Income of Individual Debtor(s), reflecting "combined average

monthly income" of $3,906.00, and Schedule J, Current Expenditures of

Individual Debtor(s), reflecting "average monthly expenses" of $3,376.00, leaving

monthly net income of $530.00.  *See* Doc. No. 1.[4]

---

[3]  BAPCPA added § 521(a)(1)(B)(v) ("The debtor shall – file – a statement of the amount
of monthly net income, itemized to show how the amount is calculated."), a provision
implemented by Interim Fed. R. Bankr. P. 1007(b)(6), which states: "A debtor in a chapter 13
case shall file a statement of current monthly income, prepared as prescribed by the appropriate
Official Form, and, if the debtor has current monthly income greater than the median family
income for the applicable state and family size, a calculation of disposable income in accordance
with § 1325(b)(3), prepared as prescribed by the appropriate Official Form."  *See also In re
Tranmer*, 355 B.R. 234, 237 n.1 (Bankr. D. Mont. 2006).  Use of Official Forms is required.  *See*
Fed. R. Bankr. P. 9009.  The Court here uses the terminology "Form 22C" though the parties
occasionally refer to "Form B22C" as do some decisions.

[4]  In addition to Form 22C, debtors are also required to file schedules of current income
and expenses.  *See* § 521(a)(1)(B)(ii); *see also* Fed. R. Bankr. P. [Interim] 1007(b)(1)(b).

MEMORANDUM OF DECISION - 2

Debtors' chapter 13 plan proposed monthly payments of $120.00 for 60 months. Doc. No. 4 at 2.[5] Debtors have used and will use some – but not all – of the $530.00 available to them as monthly net income, as evidenced by Schedules I and J, to make these plan payments.

It is uncontested that Debtors' plan will not fully pay unsecured creditors.[6] The chapter 13 trustee, C. Barry Zimmerman ("Trustee"), objected to confirmation of the plan, raising issues of Debtors' failure to either pay unsecured creditors in full or to pay their projected disposable income, *see* § 1325(b)(1)(B), and noting the discrepancy between the net monthly amounts shown on Form 22C and on Schedules I and J. *See* Doc. No. 27. Trustee also argued that Debtors were "double dipping" their mortgage expense in calculating their expenses. *Id.*[7] In briefing, Trustee also argued that Debtors' approach lacked good faith under

---

[5] Debtors argue in briefing that they will make 2 payments at this amount, then 57 payments at $133.00, and a final payment of $145.00 (totaling $7,966.00). Doc. No. 32 at 3. The increase was needed to deal with an unexpected secured claim. *Id.* Debtors intend on reflecting this increase in the order of confirmation rather than in an amended plan.

[6] Debtors' amended Schedule F, Doc. No. 40, lists $74,622.00 in nonpriority unsecured claims. Their analysis, *see* Doc. No. 32 at 3, reflects that the payments into the plan totaling $7,966.00 will pay Trustee's fees, Debtors' attorney's fees, and secured creditors, with at best only a couple hundred dollars available for unsecured creditors. If the monthly net income as shown in schedules I and J were committed, the total payments into the plan would substantially increase, exceeding $31,000.00, but still would not provide full payment to unsecured creditors.

[7] Trustee's preconfirmation "recommendations" raised this issue, *see* Doc. No. 27, but Trustee did not address it in his later briefing. The Court was advised at hearing that Trustee had "accepted" Debtors' "explanation" of the issue, though Trustee's conclusions on the question were never explained to the Court.

MEMORANDUM OF DECISION - 3

§ 1325(a)(3).  Doc. No. 31.[8]

Debtors contend they are free to use their excess monthly funds, as reflected on Schedules I and J, as they deem necessary to satisfy § 1322(a) and (b) standards, and/or the best interest of creditors, secured claim treatment, and feasibility requirements of § 1325(a)(4), (5) and (6).  Debtors argue that the manner in which BAPCPA was enacted prohibits the trustee or unsecured creditors from insisting they contribute any additional portion of these available moneys to pay unsecured creditors as "projected disposable income" under § 1325(b).  Debtors' reasoning is that Form 22C controls, and that line 58 of that Form establishes the amount that must be paid to unsecured creditors monthly for the applicable commitment period should such an unsecured creditor or a trustee object to confirmation under § 1325(b)(1).

**DISCUSSION**

A number of issues are presented, and some have not yet been addressed by written decision in this District.  The primary issue involves how Debtors' projected disposable income is to be calculated for purposes of § 1325(b).  Subsumed within that inquiry are several issues, including how Debtors are to claim expenses under § 707(b)(2), incorporated here by § 1325(b)(3), in reaching

_____

[8] The matter was submitted without presentation of evidence.  Instead, the parties relied on the pleading record and written and oral argument.  Trustee's "good faith" argument is thus urged solely on the fact that Debtors propose to meet the projected disposable income requirement by making payments to unsecured creditors based strictly on the number on line 58 of Form 22C.

MEMORANDUM OF DECISION - 4

that projected disposable income amount.[9]  Lastly, there is the issue of good faith.

The burden is on Debtors to establish that their plan is confirmable.  *Barnes v. Barnes (In re Barnes)*, 32 F.3d 405, 407 (9th Cir. 1994) (citing *Chinichian v. Campolongo*, 784 F.2d 1440, 1442 (9th Cir. 1986)); *In re Naslund*, 359 B.R. 781, 784 (Bankr. D. Mont. 2006); *In re Stella*, 2006 WL 2433443, 06.3 I.B.C.R. 67, 68 (Bankr. D. Idaho 2006) (citing *Ho v. Dowell (In re Ho)*, 274 B.R. 867, 883 (9th Cir. BAP 2002)).  BAPCPA did not change the burden.

The Court concludes, for the reasons that follow, that Debtors have not carried this burden.  Confirmation of the proposed plan will be denied.

## I.   Trustee's § 1325(b)(1) objection, and the calculation of projected disposable income

### A.   Debtors are above median income debtors

After BAPCPA, the path chapter 13 debtors take through bankruptcy depends, in part, on their income in the six-month period before the petition's filing.[10]  This six-month income information, including the average monthly

---

[9]  The Court considers the issue of how Debtors calculated and claimed their mortgage and housing expenses, notwithstanding Trustee's alleged concession on the question.  *See In re Loper*, 2007 WL 1203621 at *3 (Bankr. D. Colo. Jan. 24, 2007) (holding once a § 1325(b)(1) objection is raised, court must scrutinize debtor's income and expenses to determine if projected disposable income is committed, and stating "Although an objector may only object to a particular itemized expense, the court is free in its analysis to consider all income and expenses."); *accord In re Ives*, 289 B.R. 726, 728 (Bankr. D. Ariz. 2003) (holding court has responsibility to ensure plan compliance with the Code even in absence of objection) (citing *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1213-14 & n.5 (9th Cir. 1994)).

[10]  *See* § 101(10A) defining current monthly income, a term used in § 1325(b) as discussed further below.

MEMORANDUM OF DECISION - 5

income that results, is captured on Form 22C, then the average is multiplied by 12

("annualized") in line 15 of that Form so that it can be compared to the annual

median family income in the State for similarly sized families.  This comparative

Idaho median income information, adjusted periodically for inflation, is available

at the U.S. Trustee's website.[11]  *See also* § 101(39A) (defining median family

income).  Idaho's annual median income at the time Debtors filed their petition

was $45,584.00 for a family of two.  The annualized income on Debtors' Form

22C was $66,425.64.  Doc. No. 6 at lines 15, 21.  They are thus "above median

income" debtors.  Debtors do not argue otherwise.

### B.    Debtors' applicable commitment period is five years

Section 1325(b)(1)(B) as amended states:

> If the trustee or the holder of an allowed unsecured claim objects to
> the confirmation of the plan, then the court may not approve the plan
> unless, as of the effective date of the plan –
>
> . . .
>
> (B) the plan provides that all of the debtor's *projected disposable
> income* to be received in the *applicable commitment period*
> beginning on the date that the first payment is due under the plan
> will be applied to make payments *to unsecured creditors* under the
> plan.

(Emphasis added).[12]

---

[11]

*See* http://www.usdoj.gov/ust/eo/bapcpa/20061001/bci_data/median_income_table.htm.  There is
also a link on this Court's website, http://www.id.uscourts.gov.

[12]  The alternative under § 1325(b)(1)(A), full payment of claims, is inapplicable in the
(continued...)

MEMORANDUM OF DECISION - 6

While this provision's "projected disposable income" language will be considered momentarily, the "applicable commitment period" can be quickly addressed.  Under §1325(b)(4)(A), the applicable commitment period varies based on a debtor's income.  The applicable commitment period is three years for below median income debtors, and five years for above median income debtors.[13] Accordingly, Debtors' applicable commitment period is five years.  *See* § 1325(b)(4)(A)(ii).  Debtors agree, and have proposed a five year plan.  *See supra* note 5.

### C.    "Disposable income"

Calculating "disposable income" is addressed first under § 1325(b)(2), which states in relevant part:

> For purposes of this subsection, *"disposable income" means current monthly income* received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such

---

[12](...continued)
present case.  *See supra* note 6.

[13]  There is a debate in the case law about whether the applicable commitment period imposes a temporal or monetary requirement.  *Compare*, *e.g.*, *In re Swan*, 2007 WL 1146485 at *9-13 (Bankr. N.D. Cal. Apr. 18, 2007) (posing issue, surveying decisional law and arguments, and concluding it is a monetary requirement); *with In re Mullen*, 2007 WL 1452234 at *2-4 (Bankr. D. Or. May 14, 2007) (similar survey and analysis, concluding that a majority of bankruptcy courts find it a temporal requirement, and agreeing with that view), *and with In re Luton*, 2007 WL 756373 (Bankr. W.D. Ark. Mar. 8, 2007) (same).  *See also In re Grant*, 2007 WL 858805 (Bankr. E.D. Tenn. Mar. 19, 2007) (temporal requirement); *In re Slusher*, 359 B.R. 290, 300-305 (Bankr. D. Nev. 2007) (temporal requirement); *In re Casey*, 356 B.R. 519, 526-28 (Bankr. E.D. Wash. 2006) (temporal requirement); *In re Fuger*, 347 B.R. 94, 96-101 (Bankr. D. Utah 2006) (both a monetary and temporal provision).  This issue need not be resolved in the instant case.

MEMORANDUM OF DECISION - 7

child) *less amounts reasonably necessary to be expended* –
(A) (i) for the maintenance or support of the debtor or a dependent
of the debtor[.]

(Emphasis added).[14]

"Disposable income" is therefore the difference between two components:
"current monthly income" and "amounts reasonably necessary to be expended" for
the maintenance or support of the debtor. Calculation of current monthly income
is the same for all debtors, while calculation of reasonably necessary expenses
varies under § 1325(b)(2) and (b)(3) depending on a debtor's status as below
median income or above median income. The income component is addressed
first.

### 1.    "Current monthly income"

Pursuant to the BAPCPA definition found in § 101(10A), "current monthly
income"

(A) means *the average monthly income from all sources that the
debtor receives* (or in a joint case the debtor and the debtor's spouse
receive) without regard to whether such income is taxable income,
*derived during the 6-month period ending on–*

*(i) the last day of the calendar month immediately preceding the
date of the commencement of the case if the debtor files the schedule
of current income required by section 521(a)(1)(B)(ii); or*

---

[14]  The § 1325(b)(2) definition also includes deduction for "amounts reasonably necessary
to be expended" for certain domestic support obligations and charitable contributions, *see*
§ 1325(b)(2)(A)(i), (ii), and "expenditures necessary for the continuation, preservation, and
operation" of any business in which the debtor is engaged, *see* § 1325(b)(2)(B). None of these
provisions are implicated in the present case.

MEMORANDUM OF DECISION - 8

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii)[.]

(Emphasis added).[15]

"Current monthly income" is therefore a six-month historical average of a debtor's income ending on the last day of the calendar month preceding the date of filing.

### 2.      Current monthly income's role in calculating disposable income and projected disposable income

"Current monthly income" is a defined and statutorily mandated component of "disposable income." *See* § 1325(b)(2).  However, when § 1325(b) is triggered by an objection, its language requires that the plan apply all debtor's "*projected disposable income*" to pay unsecured creditors.  *See* § 1325(b)(1)(B) (emphasis added).

The presence of this "forward-looking" adjective has generated several dozen reported decisions.[16]  As recently summarized:

---

[15] Section 101(10A)'s exclusion of Social Security benefits and payments received by debtors who are war crime or terrorism victims, and its inclusion of "any amount paid by any entity other than the debtor . . . on a regular basis for the household expenses of the debtor," are not implicated in Debtors' case.

[16] Additional arguments in favor of "projecting" forward a debtor's disposable income have been based on other language in § 1325(b)(1)(B), such as that providing that it is the "income *to be received* in the applicable commitment period *beginning on the date that the first payment is due* under the plan will be applied to make payments to unsecured creditors under the plan." *See, e.g., In re Watson*, 2007 WL 1086582 at *6-7 (Bankr. D. Md. Apr. 11, 2007); *In re Edmunds*, 350 B.R. 636, 646-47 (Bankr. D.S.C. 2006); *In re Hardacre*, 338 B.R. 718, 723 (Bankr. N.D. Tex. 2006).

MEMORANDUM OF DECISION - 9

The BAPCPA amendments to § 1325(b)(2) make "disposable income" dependent on a debtor's "current monthly income," but leave the term "*projected* disposable income" undefined.   The problem, though, is that "current monthly income" is a historical calculation, while the term "projected" is forward-looking.   As courts facing this conundrum have noted, the term projected means "to calculate, estimate or predict (something in the future) based on present data or trends."   *In re Jass*, 340 B.R. 411, 415 (Bankr. D. Utah 2006) (quoting *The Am. Heritage College Dictionary* 1115 (4th ed. 2002).   However, "disposable income" is based on "current monthly income,' *which is not necessarily current*, but is a snapshot of the debtor's prepetition income.

> The resolution of this apparent inconsistency with the term "projected disposable income" has generated two competing interpretations by those bankruptcy courts who have confronted the problem – each claiming to adhere to congressional purpose.   The first camp holds that the term "projected" simply means that the "current monthly income" figure from B22C must be multiplied (projected out) by the number of months of the proposed plan.   *See In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C. 2006).   This interpretation construes "projected" simply as a multiplier for the term "disposable income." . . .

The second camp holds that, because the debtor's disposable income must be used to fund the plan, the term "projected" was intended to signal a reexamination of income potential over the life of the plan.   The effective consequence of this latter construction is that the terms "disposable income" and "projected disposable income" have very separate meanings. . . .

Said otherwise, the latter camp provides a critical meaning to the term "projected" which the former would dwarf.

*In re Kibbe*, 361 B.R. 302, 307-08 (1st Cir. BAP 2007) (some citations omitted).

One might quarrel with how *Kibbe*, the only appellate decision as yet on the issue, characterizes the positions taken by the competing lines of cases.   However,

MEMORANDUM OF DECISION - 10

it is generally accepted that there are two main approaches by bankruptcy courts across the country addressing the issue.[17]

One group's view, overly simplified, is that Congress purposefully created a detailed formulaic process for determining "disposable income." Filling out Form 22C[18] will establish whether the debtor is above or below median income, establish an applicable commitment period, determine current monthly income, reduce (for above median income debtors) current monthly income by the incorporated § 707(b) expenses, and arrive at "monthly disposable income under § 1325(b)(2)" on line 58. Many if not most of the proponents of this view do not think the word "projected" impacts the way "disposable income" is calculated. Instead, they "project" the line 58 figure – whatever it might be – for the applicable commitment period by multiplying that amount by the appropriate number of months. Advocates of this approach contend the interpretation is consistent with a plain reading of § 1325(b)(1)(B) and implements Congress' apparent intent to implement a bright-line test for determining projected

---

[17] *Kibbe*, 361 B.R. at 308-11; *see also In re Lanning*, 2007 WL 1451999 at *4-6 (Bankr. D. Kan. May 15, 2007) (addressing two competing lines of interpretation); *In re Knippers*, 2007 WL 1239297 at *3-4 (Bankr. S.D. Tex. Apr. 26, 2007) (discussing same split in case law); *Grant*, 2007 WL 858805 at *6-9 (same); *In re Edmondson*, 363 B.R. 212, 215-17 (Bankr. D.N.M. 2007) (same); *but see Edmunds*, 350 B.R. at 640-42 (identifying three schools of thought). Attempts to group decisions into camps can be helpful, but often they fail to effectively convey the many nuances of the carefully written decisions of the bankruptcy courts.

[18] Through substantial effort, those involved in the federal rulemaking process created a form that enables debtors to specify the details and dollar amounts for the factors required under the statutory language. That the form is complex is no criticism of their efforts. It is a direct result of the complexity of the Code amendments. *See Slusher*, 359 B.R. at 295 (Form 22C "can be no more precise than the statute on which it is based").

MEMORANDUM OF DECISION - 11

disposable income.[19]

The other group concludes the word "projected" must be given meaning, particularly in the context of trying to determine how and how much debtors will pay creditors over 3 or 5 years. These courts contend such a determination may require more than mere reliance on the average income a debtor generated in the six months prior to the petition date, a historical view that could bear little relation to present circumstances.[20] These courts accept that, at least in some circumstances, a debtor's current and future financial condition should be susceptible to examination to ascertain "*projected* disposable income" for purposes of plan payments.

This approach comes in different forms, although its proponents appear effectively universal in rejecting any purely "mathematic" approach that relies on

---

[19]  These courts include *In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C. 2006); *In re Alexander*, 344 B.R. 742 (Bankr. E.D.N.C. 2006); *In re Guzman*, 345 B.R. 640 (Bankr. E.D. Wis. 2006); *In re Rotunda*, 349 B.R. 324 (Bankr. N.D.N.Y. 2006); *In re Tranmer*, 355 B.R. 234 (Bankr. D. Mont. 2006); *In re Kagenveama*, 2006 Bankr. LEXIS 2579 (Bankr. D. Ariz. July 10, 2006); *In re Hanks*, 362 B.R. 494 (Bankr. D. Utah 2007); and *In re Kolb*, 2007 WL 960135 (Bankr. S.D. Ohio Mar. 30, 2007). *See generally Kibbe*, 361 B.R. at 308-09 (discussing "*Barr* and Its Progeny"); *see also* 8 Collier on Bankruptcy ¶ 1325.08 at 1325-51 to 1325-68 (Alan N. Resnick & Henry J. Sommer eds., rev. 15th ed. 2007).

[20]  *See, e.g.*, *In re Pak*, 357 B.R. 549 (Bankr. N.D. Cal. 2006) (though unemployed for most of the six months prior to filing with consequently low current monthly income, debtor was earning over $100,000.00 per year at petition date). In some cases, the disconnect between history and future is coincidental. Others worry that reliance only on the six-month prefiling window offers a potential for intentional abuse. *See Baxter v. Johnson (In re Johnson)*, 346 B.R. 256, 264 (Bankr. S.D. Ga. 2006) (noting that § 101(10A)'s definition "creates an opportunity for savvy debtors to artificially reduce CMI by intentionally avoiding pre-petition income") (citing Culhane & White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?*, 13 Am. Bankr. Inst. L. Rev. 665, 689 (2005)). Congress, of course, intended BAPCPA to combat "opportunistic personal filings and abuse." H.R. Rep. No. 109-31 at 5 (April 8, 2005).

MEMORANDUM OF DECISION - 12

multiplying Form 22C's line 58 by the number of months in the applicable commitment period.  Most acknowledge that a correctly completed Form 22C provides a "starting point" or a "presumption" but conclude that, in cases where Form 22C is not an accurate predictor, it should not control the question of "projected" disposable income.

Numerous decisions have adopted some variation of the "flexible" approach, including several in the Ninth Circuit, such as *In re Mullen*, 2007 WL 1452234 (Bankr. D. Or. May 14, 2007); *In re Slusher*, 359 B.R. 290 (Bankr. D. Nev. 2007); *In re Pak*, 357 B.R. 549 (Bankr. N.D. Cal. 2006); *In re Bossie*, 2006 WL 3703203 (Bankr. D. Alaska Dec. 12, 2006); and *In re Casey*, 356 B.R. 519, 522-24 (Bankr. E.D. Wash. 2006).[21]  Though statutory construction is not a matter of plebiscite, the advocates of a flexible approach may be in the majority thus far. *See*, *e.g.*, *In re Kibbe*, 361 B.R. at 310-11 (discussing "*Hardacre* and Its Progeny"), and at 311 n. 8 (noting that "courts have generally lined up behind the *Barr* or *Hardacre* interpretations, with the latter having a more crowded field"); *but see In re Berger*, 2007 WL 1704403 (Bankr. M.D. Ga. June 11, 2007) (characterizing the other position, which it joins, as a "growing minority").

---

[21]  *See also In re Riggs*, 359 B.R. 649 (Bankr. E.D. Ky. 2007); *In re Teixeira*, 358 B.R. 484 (Bankr. D.N.H. 2006); *In re Devilliers*, 358 B.R. 849 (Bankr. E.D. La. 2007); *In re Edmunds*, 350 B.R. 636 (Bankr. D.S.C. 2006); *In re Fuller*, 346 B.R. 472 (Bankr. S.D. Ill. 2006); *In re Demonica*, 345 B.R. 895 (Bankr. N.D. Ill. 2006); *In re Grady*, 343 B.R. 747 (Bankr. N.D. Ga. 2006); *In re McGuire*, 342 B.R. 608 (Bankr. W.D. Mo. 2006); *In re Jass*, 340 B.R. 411 (Bankr. D. Utah 2006); *In re Hardacre*, 338 B.R. 718 (Bankr. N.D. Tex. 2006).

MEMORANDUM OF DECISION - 13

After examining the competing approaches, *Kibbe* explained:

> We agree with the bankruptcy court that "projected disposable income" as set forth in § 1325(b)(1)(B) must be grounded in the Debtor's anticipated income (but we say less the Income Exclusions[22]) during the term of her plan.  And we agree with the reasoning in *Jass* that Form B22C must at least be the starting point for any determination of "projected disposable income." In the event that a debtor's "current monthly income" as set forth by Form B22C is substantially the same as the actual current income at the time of confirmation of the plan, less the Income Exclusions, the inquiry begins and ends with Form B22C.  But where, as here, the "current monthly income" amount is not true to the debtor's *actual* current income,[23] courts should assume that Congress intended that they rely on what a debtor can realistically pay to creditors through his or her plan and not on any artificial measure. Attaching the word "projected" to a historical calculation assumes, without justification, that a debtor's circumstances will not change after the date of case commencement or during the plan commitment period. Life informs otherwise. Insofar as the term "disposable income" demands a look back and the term "projected" requires a look forward, the language is irreconcilable.  One must give way to the other, or the courts must fashion an interpretation that gives the greatest meaning to both.

> . . .

> Rigid adherence to a debtor's prepetition income history would commonly produce results at odds with both congressional purpose and common sense.  If a debtor's prepetition averaged

---

[22] *Kibbe* would not count the "Income Exclusions" toward a debtor's "anticipated income." *See* § 101(10A)(B) (excluding Social Security benefits, etc.); § 1325(b)(2) (excluding monthly receipt of child support, foster care, disability payments for a dependent child). However, *Kibbe* noted that debtors could *choose* to dedicate otherwise exempted income to a plan to overcome feasibility challenges.  *Kibbe*, 361 B.R. at 314 n.11.  *See also In re Schanuth*, 342 B.R. 601, 605 (Bankr. W.D. Mo. 2006) (concluding court could not compel debtors to dedicate Social Security benefits to plan, but would allow them to do so to overcome feasibility concerns).

[23] In *Kibbe*, the debtor procured a higher paying job just prior to filing.  Her six-month prepetition income generated current monthly income of $1,068.50 and was below median income.  Because her new job generated income of $5,027.00 as shown in her schedule I and her expenses were $2,645.00 per schedule J, she had excess monthly income of $2,382.00.  *See* 361 B.R. at 306-07.

MEMORANDUM OF DECISION - 14

income was significantly higher than the debtor's income at plan confirmation, statutory indifference to the change at confirmation would doom any chapter 13 plan. Conversely, if, as here, a debtor's prepetition averaged income was significantly lower than his or her income at plan confirmation, the debtor would be granted a windfall. As a result, unless a debtor's prepetition averaged income was substantially the same as it was at plan confirmation, either creditors would be cheated or, by dint of plan failure, neither the debtor nor the creditors would obtain the benefits that Congress intended for both under chapter 13 of the Bankruptcy Code. We find it unlikely that Congress intended either result.

. . .

Where the income calculation of Form B22C comports with a debtor's actual income at the time of confirmation and as reasonably anticipated for the plan commitment period, no further determination is necessary. *See*, *e.g.*, *In re Teixeira*, 358 B.R. 484 (Bankr. D.N.H. 2006). However, where the debtor's income at confirmation or as reasonably anticipated for the plan commitment period is materially different from the debtor's "disposable income" as defined by § 1325(b)(2), the court must depart from the Form B22C calculation. The calculation of disposable income according to Form B22C can not be determinative of the debtor's "projected disposable income" because it does not take into account the debtor's circumstances as of the petition date or foreseeable changes in circumstances in income during the plan commitment period. Similarly, the figures set forth on Schedules I can also not be determinative because, although they reflect circumstances on the petition date, they ignore the new statutory definition of the term "disposable income" and fail as well to account for reasonably anticipated changes in the debtor's circumstances after the petition date. If circumstances dictate that neither Form B22C nor Schedules I and J accurately portray the debtor's income (less the Income Exclusions) projected over the plan commitment period, the bankruptcy court must make a fact-based determination at the time of confirmation, whether by way of the parties' agreement or the taking of evidence.

361 B.R. at 312, 314-15 (footnote omitted).

The court in *Slusher* reached a similar conclusion holding that "for above-

MEMORANDUM OF DECISION - 15

median debtors, 'disposable income' as calculated by Form B22C is only a presumptive guide in any determination of 'projected disposable income' as required by Section 1325(b)(1)(B)." 359 B.R. at 300.[24] *Knippers*, 2007 WL 1239297 at *4, also held Form 22C "provides a presumptive definition" of projected disposable income, subject to rebuttal. *Jass* also used phrasing suggestive of a presumption in favor of Form 22C, unless adequate evidence is presented to challenge or rebut it. *See* 340 B.R. at 418-19. The courts in *Mullen*, 2007 WL 1452234 at *8, *Lanning*, 2007 WL 1451999 at *5-6, *Teixeira*, 358 B.R. at 486-87 and *Edmondson*, 363 B.R. at 217-18, also embrace a "presumptive" approach.[25]

This Court also agrees and concludes that, on the income side of the projected disposable income equation, current monthly income as defined by § 101(10A) and as evidenced by the debtor's properly completed[26] Form 22C will

---

[24] It also stated: "Put another way, if the number on line 58 of Form B22C accurately represents the anticipated future income of the debtor, the court will likely use it as "projected disposable income," in large part because, by hypothesis, there are no facts which could rebut the presumption. Yet in certain circumstances, such as when a debtor gains or loses a job or when he or she receives an increase or decrease in pay immediately before filing bankruptcy, Form B22C is less authoritative, and serves only as a starting point for an investigation that will include an examination of Schedules I and J." 359 B.R. at 297-98.

[25] An argument could be made in opposition to a "rebuttable presumption" approach, because Congress appeared to know how to expressly articulate such presumptions when it wanted. *See*, *e.g.*, § 362(c)(3)(C), § 707(b)(2)(A). However, there is no denying the practical utility of using Form 22C as establishing, "presumptively" or otherwise, "projected" income in those cases where no party challenges the accuracy of "current monthly income" as a predictor.

[26] Parties may assert that there are calculation errors in Form 22C that must be remedied to arrive at the correct number, even if there is no argument of changed circumstance impeaching
(continued...)

MEMORANDUM OF DECISION - 16

control *unless* trustees, creditors or debtors challenge that historically calculated

income average as unrealistically high or low given the debtor's actual factual

circumstances[27] and present evidence to support that claim and substantiate the

magnitude of the variation.[28]

This approach acknowledges Congressional choice of a more formulaic

approach to the issue, and it gives weight to the formula Congress created.[29]  And

it gives ready predictability to the process in all chapter 13 cases *except* those

where the reality of the debtors' actual finances demands adjustment.  The need for

such an exception is indicated by the use of the term "projected" and the balance

of the language in § 1325(b)(1) and by the overall structure of chapter 13.[30]

_____

[26](...continued)
the predictive accuracy of the six-month historical average.

[27]  Without attempting to predict all the ways in which this issue might arise, the Court
notes that trustees and unsecured creditors can object under § 1325(b)(1), and that debtors have
recourse to § 1325(b)(3) which expressly incorporates § 707(b)(2)(B).  *See Berger*, 2007 WL
1704403 at *2.

[28]  One rather obvious source of information is a debtor's schedule I.  Even though Form
22C is now required, completion and filing of schedule I is also still required.  *See supra* notes 3,
4.  That schedule I is structured to capture "projected" income is unmistakable.  Line 17 of
schedule I requires debtors to "Describe any increase or decrease in income reasonably
anticipated to occur within the year following filing of this document."  (Schedule I thus appears
to also satisfy § 521(a)(1)(B)(vi) which requires the filing of "a statement disclosing any
reasonably anticipated increase in income or expenditures over the 12-month period following the
date of the filing of the petition.").  *See also Lanning*, 2007 WL 1451999 at *5-6 (discussing,
*inter alia*, schedule I).

[29]  The Court fully appreciates that others would acknowledge the Congressional choice
even more forcefully and give more, even conclusive, weight to the formula.  *See*, *e.g.*, *Kolb*,
2007 WL 960135 at *11.

[30]  In further support of this approach, bankruptcy courts in this Circuit have noted that
the word "projected" also appeared in the phrase "projected disposable income" in pre-BAPCPA

(continued...)

MEMORANDUM OF DECISION - 17

Focusing the inquiry forward in appropriate cases also fulfills Congress' general

intent as to what debtors should pay creditors.[31]  In sum, as stated in *Devilliers*:

> Whatever Congress' intention, it falls to the courts to make the
> amendments it created function within the larger scheme of the
> Code.  By viewing the historical calculations of disposable income
> through the prism of current circumstance, the Court may both
> "project" debtor's future disposable income and give effect to the
> entirety of the Code's provisions.

358 B.R. at 859.

In the present case, neither the objecting Trustee nor Debtors argue that

Debtors' historical "current monthly income" is not adequately income predictive.

Neither points to any change of circumstance that would open the door to

consideration of evidence to establish a different income component for purposes

of calculating disposable income.  Debtors' income is $5,535.47.  *See* Doc. No. 6

at line 20, 53.

### 3.    The expense side of calculating disposable income

A debtor's annualized income at the time of filing determines not just the

applicable commitment period but also how the debtor must calculate expenses.

---

[30](...continued)
§ 1325, and that this word was given a forward-looking construction by the Ninth Circuit Court
of Appeals, thus indicating how the word should be properly construed under BAPCPA.  *See
Mullen*, 2007 WL 1452234 at *6 (discussing *Anderson v. Satterlee (In re Anderson)*, 21 F.3d 355,
357 n.5 (9th Cir. 1994)); *Slusher*, 359 B.R. at 296 (same).

[31]  "The heart of [BAPCPA's] consumer bankruptcy reforms consists of the
implementation of an income/expense screening mechanism ('needs-based bankruptcy relief' or
'means testing'), which is intended to ensure that debtors repay creditors the maximum they can
afford."  H.R. Rep. No. 109-31 at 2.  "A fourth factor [supporting bankruptcy reform] relates to
the fact that some bankruptcy debtors are able to repay a significant portion of their debts[.]"  *Id.*
at 5 (addressing means test in the context of chapter 7 eligibility).  *See also infra* note 33.

MEMORANDUM OF DECISION - 18

By virtue of the manner in which § 1325(b)(2) and (3) are written, below median income debtors simply use Schedule J to assert the "amounts reasonably necessary to be expended . . . for the maintenance or support of the debtor" and dependents.[32]

For above median income debtors, however, expenses are not based on schedule J.  Instead, for them, "[a]mounts reasonably necessary to be expended under [§ 1325(b)(2)] *shall be determined* in accordance with subparagraphs (A) and (B) of section 707(b)(2)."  *See* § 1325(b)(3) (emphasis added); *see also, e.g., In re Rezentes*, 2007 WL 988055, at *4 (Bankr. D. Haw. Apr. 2, 2007) ("Congress' use of the term 'shall' in section 1325(b)(3) and 707(b)(2) makes the use of the means test expenses mandatory for above-median debtors."); *Edmondson*, 363 B.R. at 218-19 (same); *Tranmer*, 355 B.R. at 246 (same).[33]  Form 22C is structured accordingly.[34]

---

[32]  *See, e.g., Teixeira*, 358 B.R. at 486; *Fuller*, 346 B.R. at 483-85; *McGuire*, 342 B.R. at 611; *Schanuth*, 342 B.R. at 604.  The use of Schedule J allows debtors to forecast such expenses. That schedule requires debtors to "Complete this schedule by estimating the average or projected monthly expenses of the debtor and the debtor's family at time case is filed."  It also, at line 19, requires a description of "any increase or decrease in expenditures anticipated to occur within the year following the filing of this document."  *See also* § 521(a)(1)(B)(vi).

[33]  Sections 707(b)(2)(A) and (B) are at the core of the means test; they provide the formula used to funnel "can-pay" chapter 7 debtors into chapter 13.  *Fuller* notes that mandating the use of standardized expenses for above median income chapter 13 debtors under this same statutory regime appears spurred by similar concerns of abuse.  346 B.R. at 484-85; *see also* Hon. Eugene R. Wedoff, *Means Testing in the New § 707(b)*, 79 Am. Bankr. L.J. 231, 240-41 (Spring 2005) (means test intended to channel into chapter 13 those chapter 7 debtors with sufficient income to pay creditors, and noting chapter 13 incorporates same test for disposable income for above median income debtors).

[34]  Form 22C enables both below median income and above median income debtors to comply with BAPCPA's complex requirements.  Current monthly income is, as noted earlier, the same for all debtors and is calculated in Part I.  Determination of the "applicable commitment

(continued...)

MEMORANDUM OF DECISION - 19

Use of § 707(b)(2) expenses for above median income debtors cuts across the divide in the case law discussed above, and has been adopted by proponents of both stricter and more flexible approaches to projecting the income side of disposable income. Even some courts that recognize an ability to evaluate the predictive accuracy of current monthly income, using schedule I or other evidence, find that the mandatory language of § 1325(b)(3) incorporating § 707(b)(2) limits similar flexibility regarding expenses.[35]

This Court agrees with the basic proposition that the language of § 1325(b)(3) limits above median income debtors to the expenses categorized in § 707(b)(2)(A) and (B). Congress was very specific as to the expenses it wanted to allow above median income debtors. Whether some of the expenses under

---

[34](...continued)
period" and whether expenses are to be calculated under § 1325(b)(3) comprise Parts II and III respectively. Below median income debtors stop there, and verify and execute Form 22C. *Id.* at lines 23, 60. Above median income debtors must complete the balance of Form 22C. *Id.* at line 23. Part IV captures all of the allowable § 707(b)(2) expenses for above median income debtors. Upon completing Parts I-IV, the above median income debtor moves to Part V to calculate "disposable income" which is shown on line 58.

[35]  *See*, *e.g.*, *Edmondson*, 363 B.R. at 219-20 ("In sum, the Court finds that in computing the 'projected disposable income' for an above-median income debtor, the income side of the equation begins with Form B22C and takes into account the debtor's actual income as reported on schedule I, while the expense side of the equation is restricted by the applicable expenses reported on Form B22C."); *Teixeira*, 358 B.R. at 487 n.6 (noting that, on the question of calculating expenses for the above median income debtor, it parts company with *Jass* which allows use of schedule J, and instead follows the plain language of § 1325(b)(3), and further noting that it sees "no reason to deviate from this [approach to expenses] when a debtor has experienced a change in circumstances."); *Bossie*, 2006 WL 3703203 at *2 (concluding that while Form 22C is not the sole factor to be used in determining debtors' anticipated or projected income, above median debtors are limited to the means test expenses); *Hardacre*, 338 B.R. at 721-722 (holding that if debtor is above median income, "then the debtor's expenses must be determined in accordance with the means test in section 707(b)(2)").

MEMORANDUM OF DECISION - 20

§ 707(b)(2) may be more generous than what would be allowed under a schedule

J, or more miserly, is of no moment.[36]  The text of § 1325(b)(3) is sufficiently

clear, and there is nothing patently absurd about forcing them to calculate

expenses in accordance with § 707(b)(2)(A) and (B).  *See Casey*, 356 B.R. at 524

(noting that it is "the prerogative of Congress" to require use of standardized

expenses for above median debtors, even if that means debtors might pay less to

creditors than under prior law).[37]

 The expense side of the projected disposable income equation is not,

however, fully resolved by acknowledging the basic proposition that above

median income debtors must use means test expenses.

 Recall § 1325(b)(1) requires, on objection, all of a debtor's "projected

disposable income" received during the pendency of a plan be applied to make

payments to unsecured creditors.  "Disposable income" is defined by § 1325(b)(2)

as current monthly income received "less amounts reasonably necessary to be

expended for support" of the debtor and his or her dependents.  Projection thus

---

[36] "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991).

[37] *In re Winokur*, 2007 WL 174011 (Bankr. E.D. Va. Jan. 18, 2007), observes that, though the Chandler Act of 1938 and the Reform Act of 1978 opted for case-by-case determinations, BAPCPA opted for standardized determinations, an election within Congressional purview.  The court acknowledged that a standardized approach may prevent some debtors from paying creditors even though they want to, while allowing other debtors to pay less than they have the means to pay.  But it concluded that Congress may have elected to tolerate abuse, even visible abuse, under the standardized or formulaic approach believing that, as a whole, the bankruptcy system would be better served.

MEMORANDUM OF DECISION - 21

effects both income *and* expenses.

In pre-BAPCPA practice, all chapter 13 debtors initially alleged their reasonably necessary expenses on their schedule J. Objecting trustees and unsecured creditors could challenge those assertions. Prior to October, 2005, in order to determine "projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan" (as pre-BAPCPA § 1325(b)(1)(B) read), parties could argue and courts were called upon to evaluate the reasonableness and the necessity of a debtor's asserted expenses, and other factors related to whether a debtor would in fact incur such expenses or for what portion of the plan's term they would be incurred. The process was unmistakably forward-looking. *See supra* note 30.

This same general procedure still applies to below median income debtors under BAPCPA given the language of current § 1325(b)(1)(B) (still requiring "projection") and § 1325(b)(2) (limiting expenses to those "amounts reasonably necessary to be expended").[38] *See supra* note 32.

While § 1325(b)(3) requires that "[a]mounts reasonably necessary to be expended under paragraph (2)" be determined, for above median income debtors, in accordance with § 707(b)(2)(A) and (B), this proviso does not alter either the

_____

[38] The phrasing in § 1325(b)(2) echoes that found in the pre-BAPCPA version, which provided "For purposes of this subsection, 'disposable income' means income which is received by the debtor and which is not reasonably necessary to be expended – (A) for the maintenance or support of the debtor or a dependent of the debtor[.]"

MEMORANDUM OF DECISION - 22

need for "projection" found in § 1325(b)(1) or the limitation of expenses in

§ 1325(b)(2) to only those amounts reasonably necessary to be expended. So, as

with the income component, the expense side of disposable income is also subject

to evaluation in light of the debtor's post-petition plan proposals, even though that

inquiry is circumscribed by the overlay of § 707(b)(2).

    *Edmunds* considered this issue and found that the Code's language required

the court to inquire into two matters: first, determination of the debtor's income

and, second, what portion of that income is disposable after deduction of amounts

reasonably necessary for support as determined by the means test. 350 B.R. at

643. It concluded that:

> Congress has mandated that courts allow debtors those categories of
> expenses recognized under the Means Test so long as those expenses
> are "reasonably necessary" and "to be expended." *See* 11 U.S.C.
> § 1325(b)(2) and (3). The word "projected" is relevant to determine
> allowed expenses because "projected" modifies "disposable
> income," which is a computation of both income and expenses.

*Id*. Among the cases relied on by *Edmunds* was *In re McPherson*, 350 B.R. 38

(Bankr. W.D. Va. 2006), which held:

> The word "projected" in the phrase "projected disposable income"
> modifies each of the component parts of "disposable income," that
> is, it modifies "current monthly income" and it modifies "amounts
> reasonably necessary to be expended for support." "Projected
> disposable income," then, means the "projected current monthly
> income" less "projected amounts reasonably necessary to be
> expended for support" where "reasonably necessary to be expended
> for support" is to be determined in accordance with Subparagraphs
> 707(b)(2)(A) & (B).

MEMORANDUM OF DECISION - 23

> . . . [In focusing] on the phrase "projected . . . amounts reasonably
> necessary to be expended for support"[,] the word "amounts" is
> modified by three terms: (1) the adjective "projected"; (2) the
> adjective phrase "reasonably necessary for . . . support"; and (3) the
> infinitive phrase "to be expended."  The Court must give meaning
> and import to each of these three terms.  *See Negonsott v. Samuels*,
> 507 U.S. 99, 106, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993).

350 B.R. at 43-44.  *See also In re Nowlin*, 2007 WL 1095449 at *3 (Bankr. S.D. Tex. Apr. 11, 2007) (finding that "projected" as a modifier of disposable income "requires the Debtor to account for any events which will definitely occur during the term of the Plan that would alter either the income or expense side of the disposable income calculation"); *In re Renicker*, 342 B.R. 304, 309 (Bankr. W.D. Mo. 2006) (holding "the plain language of § 1325(b)(2) unambiguously indicates that prospective - not historical - expenses are to be used to calculate disposable income"); *Devilliers*, 358 B.R. at 859-62 (considering relationship of "historical" expenses incurred to "reasonably necessary" and "applicable" post-petition expenses allowable under the means test).

These cases indicate that the parties may address, and the Court may consider, whether a given expense – *within* those expenses authorized by § 707(b)(2)(A) and (B) – should be allowed when considered in light of the debtor's post-petition circumstances and, importantly, the proposed chapter 13 plan.[39]  As *Edmunds* notes, this approach is consistent with Congressional intent

---

[39] Thus, *McPherson* held that "[p]ayments that a debtor does not propose to make during the pendency of the plan and that the debtor is not required to make under the plan cannot be said
(continued...)

MEMORANDUM OF DECISION - 24

and legislative history, *see* 350 B.R. at 643 n.9, and "is not a modification as to

how debtors complete the income or expense portions of Form B22C but rather

. . . is merely the application of the Means Test viewed through the lens of

§ 1325(b) and Congress's instruction that the courts should 'project' disposable

income, based upon the disposable income to be received" during the debtor's

plan. *Id.* at 644.

        This Court finds the approach in *Edmunds*, *McPherson* and like cases gives

meaning to and implements the language in § 1325(b)(2) and (3).  It is consistent

with the overall structure of the disposable income provisions, and with

Congressional intent to require debtors to pay creditors to the extent of their post-

petition ability.  It also provides consistent treatment of both below median

income and above median income chapter 13 debtors – both groups are subject to

the same forward-looking inquiry and their proposals tested for reasonableness

and necessity, even though the applicable expenses are based on schedule J for the

former and § 707(b)(2) for the latter.  It is also consistent with the approach this

Court adopts in connection with current monthly income, as discussed earlier in

this Decision.

        The Court therefore concludes, in regard to the expense side of determining

---

[39](...continued)
to be reasonably necessary for the support of that debtor." 350 B.R. at 44-45.  It also concluded,
in conjunction with § 707(b)(2)(A)(iii) expenses, "the term 'contractually due' . . . does not carry
the same meaning in a chapter 13 case as in a chapter 7 case." *Id.* at 46.  *See also In re McGillis*,
2007 WL 1549071 at *6-8 (Bankr. W.D. Mich. May 15, 2007).

MEMORANDUM OF DECISION - 25

projected disposable income, that a below median income debtor's expenses are initially asserted in schedule J, while an above median income debtor's expenses must be claimed in accord with § 707(b)(2) standards as incorporated by § 1325(b)(3).  Though expenses for above median income debtors are to be "determined in accordance with" § 707(b)(2), other Code language (*i.e.*, "projected," "reasonably necessary" and "to be expended") allows parties to contest and the Court to consider the provisions of the debtor's proposed plan as well as events that will definitely occur during the pendency of the plan.  In this aspect, below median income debtors and above median income debtors are treated alike.[40]

Trustee's basic objection to confirmation under § 1325(b)(1) is that Form 22C should not control and that Debtors' schedules I and J show excess monthly income, all of which should be paid as "projected disposable income."  Such an approach is not well taken for these above median income Debtors.  However, to fully resolve Trustee's § 1325(b)(1) objection and to determine whether Debtors' plan merits confirmation, the Court must analyze the manner in which Debtors calculated their Form 22C expenses.

---

[40]  Though imperfect, the Court's formulation attempts to give meaning to the BAPCPA amendments at issue and the overall structure of chapter 13.  *Accord Slusher*, 359 B.R. at 299 n.15 (characterizing its own result as "the least flawed of all possible interpretations, each of which is in some way unsatisfactory in its own right").

MEMORANDUM OF DECISION - 26

**4.      Debtors' calculation of expenses under incorporated
§ 707(b)(2)(A)**

Section 707(b)(2)(A) is incorporated by § 1325(b)(3) for above median

income debtors.  Subparagraph (A)[41] establishes the means test and the expenses

and calculations required thereunder.  Tersely summarized, the debtor can claim

under § 707(b)(2)(A)(ii)(I):

> – "applicable" monthly expense amounts under IRS National Standards[42]
> and Local Standards;[43]
> – "actual" monthly expenses for categories specified as Other Necessary
> Expenses (including health insurance, disability insurance, health savings
> account expenses);
> – monthly amounts needed to maintain the safety of the debtor and
> dependents from family violence under federal law; and
> – additional allowances for food and clothing up to 5% of the National
> Standards;

and under § 707(b)(2)(A)(ii)(II):

> – expenses for care and support of elderly, chronically ill or disabled family
> members unable to pay such expenses themselves;

and under § 707(b)(2)(A)(ii)(III):

---

[41] Using the hierarchical scheme from legislative drafting manuals, as explained in
*Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60-61 (2004), statutes are identified by
section and then subdivided in the following order: subsections, starting with (a); paragraphs,
starting with (1); subparagraphs, starting with (A); and clauses, starting with (i).  Those manuals
continue the subdivision with subclauses, starting with (I); then items, starting with (aa); and
subitems (AA).

[42] The National Standards set allowances for five types of expenses: food, clothing,
household supplies, personal care and miscellaneous expenses.  These are uniform throughout the
United States (with exceptions for Alaska and Hawaii), and are based on family size and gross
monthly income.

[43] The Local Standards set allowances for two categories: transportation and housing.
These allowances vary by county within each State and by family size (for housing), and by
Census region and number of cars (transportation).

MEMORANDUM OF DECISION - 27

> – the expense of administering a chapter 13 plan up to 10% of projected
> plan payments;

and under § 707(b)(2)(A)(ii)(IV):

> – expenses for dependent children to attend public or private school up to
> $1,500.00 per year, per child;

and under § 707(b)(2)(A)(ii)(V):

> – home energy expenses.

Modifiers abound in each of these several clause (ii) categories. The modifiers are
not consistently used, though some are redundantly used. For example, these
expenses must be (or at times must be "demonstrated" or "documented" or
"explained" to be) "reasonable," "necessary" or "reasonably necessary."[44] There is
also a significant limitation on clause (ii) expenses:

> Notwithstanding any other provision of this clause [(ii)], the monthly
> expenses of the debtor shall not include any payments for debts.

*See* § 707(b)(2)(A)(ii)(I). Though this sentence obviously has relevance to those
Standards listed in subclause (I) of clause (ii), where the sentence appears, it
applies to expenses under "any other provision of this clause" and, thus, to the
other four subclauses, (II) through (V), as well.

In addition to the expenses under § 707(b)(2)(A)(ii), debtors may claim as
expenses under § 707(b)(2)(A)(iii):

> – the average monthly payments on account of all secured debts calculated
> by taking the total of all amounts as contractually due in each month of the

---

[44] The expenses in subclauses (II) through (V) are also limited to "actual" expenses.

MEMORANDUM OF DECISION - 28

60 months following the date of the petition and any additional amounts to secured creditors needed under a chapter 13 to maintain possession of a primary residence, motor vehicle or other collateralized property necessary for the support of debtor and dependents, divided by 60;

and under § 707(b)(2)(A)(iv):

– expenses for payment of all priority claims (including alimony and support), calculated by taking the total of all debts entitled to priority and dividing by 60.

Most of these expenses are not at issue in the present case. However, there is a problem with Debtors' assertions under § 707(b)(2)(A)(ii)(I)'s Local Standards.

For context, the parties have agreed Debtors' Form 22C correctly shows income of $5,535.47 per month. Debtors' Form 22C claims total expenses and adjustments of $6,034.31. Doc. No. 6 at line 57.[45] This results in a negative $153.31 in asserted projected disposable income, which Debtors reported as "$0.00" on line 58. Trustee initially questioned whether Debtors properly claimed mortgage payments and housing expenses in completing Form 22C.[46]

---

[45] This figure is composed of $5,771.80 in § 707(b)(2) expenses and $262.51 in qualified retirement deductions.

[46] The Advisory Committee Notes to Official Form 22C explain how to claim them:

The IRS Local Standards provide one set of deductions for housing and utilities and another set for transportation expenses, with different amounts for different areas of the country, depending on the size of the debtor's family and the number of debtor's vehicles. Each of the amount[s] specified in the Local Standards are treated by the IRS as a cap on actual expenses, but because § 707(b)(2)(A)(ii) provides for deductions in the "amounts specified under the . . . Local Standards," the forms treat these amounts as allowed deductions. The forms again direct debtors to the website of the U.S. Trustee Program to obtain the appropriate allowances.

(continued...)

MEMORANDUM OF DECISION - 29

Debtors have a first and second mortgage payment totaling $1,377.00 per month.  They deducted their first mortgage payment ($745.00) as a secured debt payment on line 47(b) of Form 22C.  They deducted the second mortgage payment ($632.00) as part of the total secured debt payment on a continuation sheet to line 47(c).  Deduction for these secured debts is proper in this case under § 707(b)(2)(A)(iii).

However, Debtors also took a $748.00 deduction under the Local Standards for housing and utilities.[47]  *See* Doc. No. 6 at line 26.  This $748.00 figure is the difference between Debtors' actual monthly mortgage payments ($1,377.00) and the mortgage/rent component of the IRS housing Local Standard for Nez Perce

---

[46](...continued)
The Local Standards for housing and utilities, as published by the IRS for its internal purposes, present single amounts covering all housing expenses; however, for bankruptcy purposes, the IRS has separated these amounts into a non-mortgage component and a mortgage/rent component.  The non-mortgage component covers a variety of expenses involved in maintaining a residence, such as utilities, repairs and maintenance.  The mortgage/rent component covers the cost of acquiring the residence. For homeowners with mortgages, the mortgage/rent component involves debt payment, since the cost of a mortgage is part of the allowance.  Accordingly, the forms require debtors to deduct from the mortgage/rent component their average monthly mortgage payment (including required payments for taxes and insurance), up to the full amount of the IRS mortgage/rent component, and instruct debtors that this average monthly payment is the one reported on the separate line of the forms for deductions of secured debt under § 707(b)(2)(A)(iii).

[47]  The U.S. Trustee's website shows the housing expenses divided into mortgage/rent and non-mortgage components. This information bears specific notation that the IRS expense figures as shown by the U.S. Trustee are for use in completing bankruptcy forms, not for use in computing taxes or other purposes.  Concomitantly, the IRS website indicates that its data (which for housing/utilities expense is not segregated into mortgage and non-mortgage components), is for use in calculating repayment of delinquent taxes, and that "Expense information for use in bankruptcy calculations can be found on the website for the U.S. Trustee Program."

MEMORANDUM OF DECISION - 30

County, Idaho ($629.00).[48]

The applicable IRS Local Standard for housing/mortgage expense, $629.00, should be – and is – shown on line 25B(a). The total mortgage payments of $1,377.00 should be – and are – shown on line 25B(b). Under Form 22C's express instructions and consistent with the Advisory Committee Notes to the Official Form, line 25B(b) is to be subtracted from line 25B(a) in order to determine a "net mortgage/rental expense" but a negative amount cannot be entered on line 25B. *See* Form 22C at line 25B ("Do not enter an amount less than zero."); *see also* Advisory Committee Notes quoted at note 46 above ("debtors . . . deduct from the mortgage/rent component their average monthly mortgage payment . . . *up to the full amount of the IRS mortgage/rent component*"). In effect, this process allows a debtor whose actual mortgage expenses are *less* than the IRS Local Standard to claim those secured debt expenses and the balance of the Standard.

Debtors, however, have mortgage expenses *greater* than the Local Standard. Despite reaching a "zero" on line 25B,[49] they claimed the difference as an "adjustment" on line 26 contending, in the language of the Form, that "Line 25A and 25B does not accurately compute the allowance to which [Debtors] are

---

[48] The Local Standards for housing vary from county to county and, in Nez Perce County, Idaho, at the time of the filing of this case, the Local Housing and Utilities Standards for a family of two were $320.00 for non-mortgage expenses (which Debtors properly claimed here on line 25A of their Form 22C) and $629.00 for mortgage/rent. This information is not in dispute.

[49] Apparently heeding the Form's instruction, Debtors did not enter a negative number. But neither did they enter a "$0". They left line 25B blank.

MEMORANDUM OF DECISION - 31

entitled under IRS Housing and Utilities Standards[.]"  The Court finds that

Debtors' approach is in error.

Relatively early in the process of judicial interpretation of the 2005

amendments, courts concluded that

> [b]ecause  § 707(b)(2)(A)(ii)(I)  provides  that  monthly  expenses
> pursuant to the IRS Standards "shall not include any payments for
> debts," and debtors are permitted to deduct actual mortgage and car
> payment  amounts  separately,  debtors  must  deduct  from  the  IRS
> Standard expenses for their monthly mortgage and car payments to
> avoid double-dipping.

*McGuire*, 342 B.R. at 612 (citing *Hardacre*, 338 B.R. at 726).  *Hardacre* observed

that the effect of the language of § 707(b)(2)(A)(ii)(I), including what it called the

"'notwithstanding' sentence," and § 707(b)(2)(A)(iii) is "to reduce the debtor's

deduction for mortgage and car ownership expenses under the Local Standards by

the average monthly expenses for those items under section 707(b)(2)(A)(iii)," and

thus eliminate the double deduction.  338 B.R. at 726-27.  Further, it found "[t]he

effect of section 707(b)(2)(A)(ii)(I) is to permit the debtor to deduct the greater of

her actual mortgage and car ownership payments or the amounts provided in the

Local Standards.  This is because the 'notwithstanding' sentence cannot be read to

require the court to reduce the allowance under the applicable Local Standard to a

number that is less than zero[.]"  *Id.  See also In re Skaggs*, 349 B.R. 594, 600

(Bankr. E.D. Mo. 2006) (adopting *Hardacre* formulation and denying "double-

MEMORANDUM OF DECISION - 32

dip" on rental expenses).[50]

The majority of courts that have considered the housing expense question accept the idea that an above median income debtor can deduct the full amount of the mortgage/rent component of the Local Standard amount even if their actual rent expense is less than that Standard or even nonexistent.[51]  In *In re Farrar-Johnson*, 353 B.R. 224, 230-31 (Bankr. N.D. Ill. 2006), debtors claimed the full mortgage/rent component of the Local Standard even though they lived in military housing and had no "actual" rent or mortgage expense.  The court there validated the debtors' approach.  *Id.* at 230-31.[52]  In *In re Naslund*, 359 B.R. 781 (Bankr. D. Mont. 2006), the entire Standard mortgage/rent component was allowed, even

---

[50]  How to construe and apply the incorporated IRS National and Local Standards has spawned yet another BAPCPA debate among the nation's bankruptcy courts.  At its core, this debate concerns construction of the term "applicable" as used in § 707(b)(2)(A)(ii)(I), and whether use of that term gives all above median income debtors the full IRS Standard expense, especially when the term "actual" is used in connection with "other necessary expenses."  *See*, *e.g.*, *In re Armstrong*, 2007 WL 1724955 at *3 (Bankr. E.D. Wash. June 12, 2007); *see also Slusher*, 359 B.R. at 305-06.  These cases, for the most part, involve the question of whether a debtor can have an "applicable" vehicle ownership expense if that debtor has no debt or lease payments on such vehicle.  As observed in *Armstrong*, there are already over a dozen reported cases on both sides of this issue.  2007 WL 1724955 at *2.  *See also In re Lynch*, 2007 WL 138987 at *2 (Bankr. E.D. Va. May 8, 2007) (also collecting the decisions); *Swan*, 2007 WL 1146485 at *4 (same).  All three of these decisions fall into the camp that holds debtors may deduct the entire Local Standard transportation ownership expense for a vehicle that is not financed or leased.  *Armstrong*, 2007 WL 1724955 at *5-7; *Lynch*, 2007 WL 1387987 at *2; *Swan*, 2007 WL 1146485 at *4.  Although housing expenses fall within the same "applicable" Local Standards as transportation expenses, far fewer courts have analyzed these issues in connection with housing.

[51]  Each of these cases discussed here dealt with rent, not a mortgage debt.

[52]  The matter came before that court on a motion of the chapter 13 trustee to dismiss the case because the debtors refused to amend their Form 22C to delete the expense of $1,233.00 they had so claimed.  *Id.*

MEMORANDUM OF DECISION - 33

though the "rent" actually paid by those debtors was less.[53]  The debtor in *Swan*

had a monthly rent of $800.00, but claimed a Local Standard housing expense of

$1,644.00.  *See* 2007 WL 1146485 at *1-2, 8.  That court agreed with *Naslund* and

*Farrar-Johnson*, and allowed the Local Standard as claimed.  *Id.* at 8.[54]

      The issues under BAPCPA's use of the National and Local Standards are

complex, and the answer is certainly not free from doubt.  That so many courts

have with sincere and dedicated analysis reached conflicting decisions while using

the same interpretive tools is testament to the problem.  As many have now noted,

plausible arguments can be advanced on both sides.

      This Court need not today resolve all such issues.  A narrower focuses

suffices.

      Debtors' actual mortgage expenses may be, and here were, claimed as

---

[53]  Debtors' monthly rent in *Naslund* was $545.00 per month.  359 B.R. at 782.  They claimed a Local Standard housing (mortgage/rent component) expense of $772.00 as established for a family of their size in the applicable county.  *Id.* at 783.

[54]  A fourth case, *Rezentes*, 2007 WL 988055 (Bankr. D. Haw. Apr. 2, 2007), "reluctantly conclude[d] . . . debtors can claim the IRS local standard amount or their actual housing expense, *whichever is less.*"  *Id.* at *1 (emphasis added).  In that case, debtors had reduced their prepetition rent from $2,100.00 per month to $1,800.00 per month, and finally moved, with their four dependent children, into a three-bedroom home owned by one of the debtor's parents, paying $300.00 per month in rent.  On Form 22C, Debtors claimed the $2,000.00 per month Local Standard for mortgage/rent expense in Honolulu County.  *Id.* at *1-2.  That court ultimately determined that BAPCPA's incorporation of the IRS Standards suggested that the courts could also look to the IRS' own interpretations of its standards, and concluded that the Internal Revenue Manual ("IRM") treated the standard as a "cap" and would allow taxpayers only the standard or the actual expense paid whichever was less.  *Id.* at *3, *6 (relying, in part, on the analysis in *Slusher*, *see* 359 B.R. at 309-10).  *Cf. Armstrong*, 2007 WL 1724955 at *6-7, and *In re Sawdy*, 362 B.R. 898, 912-14 (Bankr. E.D. Wis. 2007) (rejecting, as have a number of other courts, the concept of implicit incorporation or use of the IRM or Financial Analysis Handbook).

MEMORANDUM OF DECISION - 34

secured debts under § 707(b)(2)(A)(iii).  Because such expenses are greater than

the mortgage/rent component of the Local Standard expense, the proposed

"adjustment" made by Debtors attempts to reap more than what clauses (ii) and

(iii) allow and violates the express and specific prohibition of including in clause

(ii) expenses "any payments for debts."  Indeed, that such payment for secured

mortgage debt is otherwise allowed as an expense under clause (iii) is strong

support for interpreting the prohibition in (ii)(I) strictly.

Debtors have in this case claimed their entire monthly mortgage servicing

of $1,377.00 under § 707(b)(2)(A)(iii).  The Court concludes that by entering

$748.00 on line 26, Debtors claimed more than § 707(b)(2)(A)(ii)(I) permits.

Reading the "adjustment" on line 26 as Debtors have directly contradicts what line

25B provides, and is not a rational construction of the provisions of

§ 707(b)(2)(A)(ii) and (iii).  The entire mortgage debt was captured elsewhere in

Form 22C, and Debtors have not established that they are entitled to an IRS

mortgage/rent housing expense in addition thereto.[55]

The effect of finding the $748.00 expense improperly claimed and

eliminating that amount on line 26, is to decrease the total of claimed § 707(b)(2)

deductions on lines 52 and 56 of Debtors' Form 22C from $5,771.80 to $5,023.80.

---

[55] While the U.S. Trustee did not brief this issue in the instant case, the U.S. Trustee's
website contains a "statement of position" on disposable income issues which reaches the same
conclusion as the Court does herein.  *See*
http://www.usdoj.gov/ust/eo/bapcpa/docs/Disposable_Income_Ch13_UST_Policies.pdf.

MEMORANDUM OF DECISION - 35

The net result is that Debtors have $249.16 in projected disposable income.[56]

Given the objection under § 1325(b)(1), that amount must be dedicated to

payment of unsecured creditors for the applicable commitment period.

## II.    Trustee's § 1325(a)(3) objection

Trustee also objected to confirmation on the basis of lack of good faith.

The sole reason, on the record Trustee presented, was Debtors' insistence on using

line 58 of Form 22C as determinative of the projected disposable income issue.

This Circuit's Bankruptcy Appellate Panel observed in *In re Nelson*, 343

B.R. 671 (9th Cir. BAP 2006), that whether a plan has been proposed in good faith

is independent of whether the "best efforts" test of § 1325(b) is met.  *Id.* at 677

n.10 (citing *Fid. & Cas. Co. of NY v. Warren (In re Warren)*, 89 B.R. 87, 94-95

(9th Cir. BAP 1988)).[57]  Though *Nelson* is a pre-BAPCPA case, the comment is

nonetheless instructive where, here, Trustee's good faith objection raises solely a

best efforts question.  And, as the Panel also noted in *Nelson*, an objection under

§ 1325(a)(3) requires evaluation of "the totality of the circumstances."  *Id.* at 677

---

[56] Current monthly income (line 53) of $5,535.47 less qualified retirement deductions (line 54) of $262.51, and less total recalculated § 707(b)(2) deductions (line 56) of $5,023.80, equals monthly disposable income (line 58) of $249.16.

[57] The Panel in *Nelson* characterized this as the "narrow holding in *Warren* (to which we still adhere)." *Id. Warren* considered good faith in general and specifically in relation to the best efforts requirement of § 1325(b).  89 B.R. at 93-95.  It concluded that "the good faith requirement under 11 U.S.C. § 1325(a)(3) is separate and distinct from the best effort requirement of 11 U.S.C. § 1325(b)(1)(B)." *Id.* at 95.

MEMORANDUM OF DECISION - 36

(citing *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1389-90 (9th Cir. 1982)).[58]

Given that the questions under § 1325(b)(1) addressed herein were not previously resolved in this District, and given the absence of evidence establishing that the "totality of circumstances" supports a conclusion that the plan was proposed in anything other than good faith, this objection will be overruled.

**CONCLUSION**

Trustee's objection to confirmation, Doc. No. 27, will be sustained, in part, for the reasons indicated above. Confirmation of the plan will be denied. Denial is without prejudice to filing an amended plan. The Court will enter an Order in accord with this Decision.

DATED:  June 27, 2007



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

---

[58]  A number of cases have considered good faith objections and the relation of § 1325(a)(3) to § 1325(b). *See*, *e.g.*, *In re McGillis*, 2007 WL 1549071 (Bankr. W.D. Mich. May 15, 2007) at *17-23; *Devilliers*, 358 B.R. at 867; *Edmunds*, 350 B.R. at 647-49. Further exploration of this subject is not warranted at this time in the instant case, given the conclusions on the objection reached above.

MEMORANDUM OF DECISION - 37